STATE of Missouri, Respondent,

v.

Edward T. POST, Appellant.

Edward T. POST, Appellant,

v.

STATE of Missouri, Respondent.

Nos. 61971, 65799.

Missouri Court of Appeals,
Eastern District,
Division Two.

May 2, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 12, 1995.

Application to Transfer Denied
July 25, 1995.

Richard H. Sindel, Sindel & Sindel, Clayton, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., John R. Watson, Asst. Atty. Gen., Jefferson City, for respondent.

SMITH, Presiding Judge.

Julie Post drowned in a bathtub in the then Omni Hotel in St. Louis. Defendant, her husband, was charged with her murder. He appeals from his conviction by a jury of murder first degree and resultant sentence of life imprisonment without probation or parole for fifty years. We reverse and remand.[1]

At 7:43 a.m. on June 3, 1986, a telephone operator at the hotel received a call from defendant stating that he had found his wife in the bathtub, reporting that she was not breathing and requesting an ambulance. Security officers went to the room and one of them, along with defendant, began CPR. Paramedics arrived shortly thereafter and Mrs. Post was transferred to a hospital, where she was pronounced dead. The first police officer at the scene testified that defendant told him that he and his wife awoke at approximately 6:30 a.m., that he gave Julie a back massage, drew her a bath, and then went jogging. Upon defendant's return he found his wife in the bathtub. Extensive expert testimony was adduced as to the cause of death and analysis of physical evidence, in particular a towel ring which had been pulled from the wall above the bathtub and was found in the water in the tub. If believed, the state's evidence established that Julie Post was drowned by a criminal agency and that agency was her husband. If defendant's evidence is believed, Julie Post fell in the tub and drowned.

In June, 1989, defendant was convicted by a jury of murder first degree. Upon a motion alleging newly discovered evidence of serious juror misconduct, the trial court ordered a new trial. We affirmed that order. *State v. Post,* 804 S.W.2d 862 (Mo.App.1991). This retrial followed. The state introduced evidence on several theories of motive, including that defendant physically abused his wife and she planned to divorce him. There was also evidence of substantial insurance coverage of wife and of defendant's economic difficulties.

The first issue we will address is the defendant's contentions that the trial court erred in allowing hearsay evidence from several witnesses pertaining to the physical abuse issue and Julie's plans to divorce her husband.[2]

The first incident concerns the testimony of friends of the Post's, Harby and Dianne Kreeger. The exact year of the incident was not certain but was believed to be either 1975 or 1976. The testimony evolved as follows:

Prosecutor: Did you have occasion after the [July 4th party] to receive any phone calls?

Harby Kreeger: Later that night I did ...

Q: Did you recognize the voice?

A: I did.

Q: Who was it?

A: Julie Post.

Q: How would you describe what she said or what she was doing?

A: She was screaming hysterically that Ed had been or was beating her.

---

1. Defendant also appealed denial of his Rule 29.15 post-conviction motion, but has raised no claim of error concerning that denial and so has abandoned it.

2. All matters raised by defendant on appeal were properly objected to and properly preserved for appeal.

Q: What did you do.

A: Frankly, I passed the phone to my wife, I didn't know what to do.

Dianne Kreeger, who testified before her husband, testified that:

Later in the night during the middle of the night we got a phone call. Harby answered and handed the phone to me and in which Julie said Ed had beaten her and she was okay at that point and I asked if I could come over there, did she want me to come and get her and come to my house with the children and she said no, she was okay, she just wanted me to know about it.

■ The state contended at trial and before us that the hearsay statements of Julie about Ed beating her were admissible under the excited utterance exception to the hearsay rule. The excited utterance, or as sometimes referred to "spontaneous exclamations," exception applies when (1) a startling event or condition occurs; (2) a statement is made while the declarant is under the stress of excitement caused by the event and has not had an opportunity to fabricate; and (3) the statement relates to the startling event. *State v. Scott,* 716 S.W.2d 413 (Mo.App.1986) [1–3]; 2 *McCormick on Evidence* § 272 (4th Ed.1992). This exception is based on the human "experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts." *Walsh v. Table Rock Asphalt Construction Co.,* 522 S.W.2d 116 (Mo.App.1975) l.c.120, (quoting VI Wigmore on Evidence § 1747(I) (3rd ed.)).

■ Missouri courts approach the exception on the basis that the utterance should be regarded as presumably inadmissible because of the rule against hearsay. The burden of making a sufficient showing of spontaneity to render the statement admissible is on the party who offers it. *Walsh v. Table Rock Asphalt Construction Co., supra* at [3–9]. The utterance must be made under the immediate and uncontrolled dominion of the senses and during the time when consideration of self-interest could not have been brought to bear through reflection or premeditation. *Id.* at [11].

In the case before us one aspect not usually present in excited utterance cases is present. In the usual case, there is independent evidence of the existence of the starting event. For instance, car wreckage in an automobile accident. The statements testified to by the Kreegers are the only evidence that an event had occurred, what that event was, and who was involved. There is a considerable logical difficulty in allowing into evidence a statement admissible only because it arises from a startling event as proof also that the startling event occurred. "The difficulty in using the statement to prove the event is the element of bootstrapping or circularity." Mueller and Kirkpatrick, *Federal Evidence* § 436 (2d Ed.1994). Nonetheless a majority of the courts and the commentators appear to support the proposition that the statement may prove the event. *Id.,* 2 *McCormick, supra* at § 272; Fed.R.Evid. 803 advisory committee notes on 1972 proposed notes; *United States v. Moore,* 791 F.2d 566 (7th Cir.1986) [1–3]; *Collins v. Equitable Life Ins. Co.,* 122 W.Va. 171, 8 S.E.2d 825 (1940) [1, 2]. None of these courts or commentators explain with any detail the reasoning for their position. Some authorities note that collateral indicators of the declarant's physical condition and demeanor constitute independent circumstantial evidence of the exciting event, making this issue largely academic. *Mueller and Kirkpatrick, supra; Committee Notes, supra; United States v. Moore, supra.*

■ Some courts have held that an excited utterance is admissible only where indepen-

dent evidence supports a finding of fact that an exciting event occurred. *People v. Burton,* 433 Mich. 268, 445 N.W.2d 133 (1989); *Truck Insurance Exchange v. Michling,* 364 S.W.2d 172 (Tex.1963). The matter is discussed in great detail in the *Burton* case. In it the court distinguished many of the "majority rule" cases on the basis that in fact some independent evidence existed in each case which tended to show the existence of a startling event. The court concluded that the excited utterance could not serve by itself to establish the fact of a startling event but that some independent evidence is required. The court held that independent evidence must establish by a preponderance of evidence that the exciting event *did* occur, not that it *could* have occurred. In *Truck Insurance Exchange* the Texas court applied a less stringent standard that *some* independent proof that the event could have occurred is necessary. We believe the Texas court approach to be sound.

■ Mrs. Kreeger's testimony clearly does not meet the Missouri requirements for an excited utterance set forth in *Walsh v. Table Rock Asphalt Construction Co., supra.* In her statement to Mrs. Kreeger Julie stated that she was "okay", did not need Mrs. Kreeger's assistance and "Just wanted [Mrs. Kreeger] to know about it". The last statement, in particular, indicates reflective thought in making the statement and even in making the phone call to a non-emergency number. Reflective thought is the antithesis of the excited utterance, which requires as its root, spontaneity. Mr. Kreeger's testimony is similarly deficient. Again the making of the phone call in itself is an indication of reflective thought since the intention expressed to Mrs. Kreeger was that someone would know. Further, there is no independent evidence that the startling event occurred. Mr. Kreeger did not observe the declarant. His statement that she was hysterical is conclusory and the state did not elicit what that conclusion was based on. Neither of the Kreegers heard anything on the telephone that indicated that a beating was in progress nor was it possible from the impreciseness of the witnesses' reporting of Julie's statement to determine when any alleged beating had occurred. There was no

testimony that Julie evidenced signs of physical abuse after this incident. There was a very large amount of evidence that the Post marriage was one of heavy drinking by both partners and strong arguments instigated by both parties and participated in with equal vigor by both parties. The state failed to carry its burden of overcoming the presumption of inadmissibility of the statements to the Kreegers and the evidence was erroneously admitted.

■ Defendant also premises error on the admission of testimony of Dan Post, defendant's brother, that, on one occasion, possibly but not clearly the same date as the Kreeger phone call, he had gone to the Post home at the request of Julie who was "very anxious". She said she wanted Dan to come over and try to get his brother calmed down because they were involved in an *altercation with each other.* When he arrived Julie said her husband was out of control and took Dan to the den and showed him a bookshelf with a piece of glass embedded in it which Julie stated happened when her husband threw a cocktail glass at her and hit the bookshelf. Dan testified that both Julie and defendant were intoxicated. It is apparent that a considerable period of time elapsed between the time Julie called Dan, he arrived at the scene, talked to his brother and was taken into the den by Julie. Dan saw no evidence of injury to Julie. There was no evidence that Julie's statement concerning the glass was made without reflection and was solely the product of a startling event. The evidence was to the contrary. The court erred in admitting this evidence.

■ Defendant also premises error on the admission of statements by Mrs. Kreeger and Stephanie Post, defendant's daughter, that Julie had told them she wanted or intended to divorce her husband. The court admitted these statements under the state of mind exception to the hearsay rule. To be admissible a decedent's state of mind declaration must be relevant. In *State v. Singh,* 586 S.W.2d 410 (Mo.App.1979) [12,13,14] the court stated that where a decedent's declaration counters defendant's claim of self-defense, suicide or accidental death such state

of mind declarations are exceptions to the hearsay rule. The state contends that because it was defendant's contention that his wife's death was accidental, her state of mind was relevant. The accident cases referred to in the Singh case are those situations where the defendant as the actor causing the death is undisputed but the issue raised is whether he acted intentionally or accidentally. *State v. Singh, supra; State v. Boliek*, 706 S.W.2d 847 (Mo.banc 1986) [6] *cert den.* 479 U.S. 903, 107 S.Ct. 302, 93 L.Ed.2d 276 (1986). Defendant here denied any participation in the death of his wife and denied that he was present when the incident which caused it occurred. Under those facts the decedent's particular state of mind that she was unhappy with her husband has no relevance. Nor does that state of mind become relevant to the issue of motive because the state provided no evidence that defendant was aware of his wife's intentions to obtain a divorce if indeed she did so intend. The statements were made some time before her death and there is no indication she took any further action to implement such intentions. In the absence of knowledge by defendant of these intentions they do not have relevancy and were erroneously admitted.

▪ Finally under this point defendant premises error on the trial court admitting testimony by Kim Autin, a friend of Julie's, that:

Well, in San Francisco when I was buying new clothes and we went into the dressing room together trying on clothes and I noticed Julie had a bruise on her arm and on her thigh and I don't know, I think the left arm and thigh, yeah, and I said it was huge and I asked my God, what happened and she told me Ed pushed her down.

The state contends the testimony was admissible under the complaints of present pain exception to the hearsay rule. The simple answer is that for the declarations to be admissible they must relate to the pain or suffering itself, and not to the circumstances which produced it. *Toon v. David G. Evans Coffee Co.*, 103 S.W.2d 533 (Mo.App.1937) [4–6]. The testimony was erroneously admitted.

▪ The erroneous admission of the evidence discussed *supra* served to allow the state to put before the jury a series of incidents of alleged bad conduct by the defendant. This bad conduct was discussed at some length in the state's summation and reply summation. With the exception of the Autin testimony no witness had ever observed signs of physical injury to Julie despite frequent business and social contact. We conclude that in this case the evidence was extremely prejudicial to the defendant and requires reversal for a new trial.

▪ Because they may arise again we will discuss certain additional issues raised by the defendant. There was additional testimony by Dan Post of alleged prior acts of misconduct by defendant as relates to his wife. Proof of prior bad acts is inadmissible unless such proof tends to establish motive, intent, absence of mistake or accident, identity, a common scheme or plan or is otherwise logically and legally relevant to the charged crimes. *State v. Bernard*, 849 S.W.2d 10 (Mo.banc 1993) [4]. To be logically relevant, evidence must have a legitimate tendency to directly establish the accused's guilt. *Id.* at [1–3]. To be legally relevant, the probative value of the evidence must outweigh its prejudicial effect. *Id.* Missouri courts often admit evidence of prior misconduct by the defendant against the same victim in murder and assault cases. *State v. Williams*, 865 S.W.2d 794 (Mo.App.1993) [8] (collecting cases). Evidence showing that defendant repeatedly physically attacked his wife may be logically relevant and admissible in demonstrating a pattern of intentional infliction of injury which could have culminated in an intentional homicide. But mutual arguments, even if vociferous and heated, do not establish intentional physical abuse. Isolated instances of abuse, particularly ones remote in time are not relevant. *State v. Shaw*, 847 S.W.2d 768 (Mo.banc 1993) [16]. We have held much of the state's evidence of abuse to be barred by the rule against hearsay. We cannot anticipate what the state may produce on retrial and we will not presume at this time to determine the admissibility of such evidence at a future trial.

In the first trial Stephanie Post testified that there was no abuse of Julie by defendant. In the trial before us she testified that on an occasion when she was six years old her father pointed a gun at her mother's chest. She also testified to many fights between her mother and father. There was evidence that Stephanie was a problem to both her parents and that the relationship between her father and herself deteriorated between the two trials for a variety of reasons. Prior to the second trial Stephanie underwent hypnosis, including hypnosis which apparently took her back to her childhood and her family relationships. Defendant objected to testimony of Stephanie on family relationships on the basis it constituted post-hypnotic memories. Defendant presented testimony pre-trial from Arthur Margulis, his former attorney who stated that when Stephanie told him of her present memories he inquired of Stephanie why she had not told him of these matters before. She responded that she did not remember them until she was hypnotized. Mr. Margulis testified that conversation occurred on April 18 or 19, 1991.

The record is unclear regarding the dates that Stephanie was hypnotized and what her pre-hypnotic memories were. The prosecutor told the court that he interviewed Stephanie on April 23, 1991, and that at that time she had undergone one hypnotic session, but in that session, nothing was discussed about her family background, the session was a relaxation session. On April 23, Stephanie gave the prosecution a tape recorded statement of the domestic abuse incidents that she recalled. The prosecution stated that Stephanie underwent a second hypnotic session on April 24, 1991, which also was not intended to aid her memory, and that in a session on April 25, Stephanie was taken back in time. The hypnotist's records were not introduced nor seen by the trial court and are not before us. The trial court ruled that Stephanie could testify concerning matters discussed in the April 23 tape recording as pre-hypnosis memories. The gun incident was not mentioned in the tape. The court ruled that Stephanie could testify to it based on the prosecutor's word "as an officer of the court" that Stephanie had mentioned that incident to an unknown "someone" prior to the 25th.[3]

In *Alsbach v. Bader*, 700 S.W.2d 823 (Mo.banc 1985) the Supreme Court ruled that hypnotically refreshed testimony is per se inadmissible. This court held in *State v. Blackman*, 875 S.W.2d 122 (Mo.App.1994) [53–55] that a previously hypnotized witness may testify if limited to her prehypnotic statements because this testimony "could not have been tainted by the hypnosis". The testimony of Stephanie was offered by the prosecution. Despite the prosecutor's and the state's apparent belief to the contrary, it was the burden of the prosecution to establish the admissibility of the testimony.[4] In this trial it failed to do so.

In *Alsbach, supra*, the Court noted the unreliability of the hypnotized subject to accurately determine after hypnosis what memories pre-date the hypnosis, or to distinguish between actual recall and confabulation invented and employed to fill gaps in the story. l.c.827. The prosecution therefore cannot rely on, or even utilize, the hypnotized subject to identify pre-hypnosis memory. The record here does not contain the records or testimony of the hypnotist. It does not reflect other than by expressions of opinion by people not present or by hearsay, when such sessions occurred, the subject matter of each session, the subject's memories prior to each of the sessions, and the source of the determinations of pre-hypnosis memory. We do not hold on the record before us that the state may not be able to provide sufficient evidence to carry its burden that some or all of Stephanie's testimony of her family relationships is legitimate pre-hypnosis memory and therefore admissible if otherwise rele-

---

3. Mr. Margulis, who testified under oath, was also an officer of the court. How the court selected the "officer" it chose to credit does not appear of record.

4. We need not determine whether that burden requires proof by clear and convincing evidence, *People v. Hughes*, 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (App.1983) [3–6] or by the preponderance of the evidence, *People v. Romero*, 745 P.2d 1003 (Colo.banc 1987) [9,10].

**238**

vant. But considerably more than was presented in this trial will be required to meet that burden.

The court also overruled defense objections to testimony by Stephanie that after the first trial defendant kicked her following an automobile accident in which she virtually destroyed a new car. We can perceive no relevance to this testimony.

■ Two other matters require some brief mention. The security chief of the Omni Hotel was allowed to testify to a "test" he conducted after the incident resulting in Julie's death. He had noticed at the time of the incident that the water in the tub seemed colder than he believed it should be. He thereafter filled the tub with hot water from the highest hot setting and timed the period until the water reached the temperature which he believed to be the same as that he had observed at the time of the incident. The highest hot setting was what he observed the knob to be set at when he was in the bathroom following Julie's death. He obviously had no knowledge of the actual temperature of the water at the time Julie first was in the tub. The "test" had no scientific basis as it was premised on an unknown initial temperature and an unmeasured final temperature. Further its relevancy is indeterminable. The state asserts that it is relevant to establish that the security officer was suspicious at the time of Julie's death. That may be true. What is not explained is what relevancy the security officer's suspicions have. The evidence should not be offered or admitted at a new trial.

Finally, defendant contends that remarks made to the jury by the trial court in the hotel room in the Omni Hotel during its deliberations indicated the court's endorsement of a position of the state on a critical issue. We believe the remarks are subject to that interpretation and assume that on retrial the court will be more circumspect.

The evidence was sufficient to establish a case of first degree murder against the defendant. Additional points raised by the defendant may not recur in the same posture on retrial, such as cross-examination of Dr. McGarry, or were rulings within the trial court's broad discretion. We will not address those.

Judgment reversed and cause remanded for new trial.

PUDLOWSKI and WHITE, JJ., concur.