

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED109061 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court of |
| | ) | St. Charles County |
| vs. | ) | 1811-CR02707-01 |
| | ) | |
| CARL JUSTIN TOWNSEND, | ) | Honorable Michael J. Fagras |
| | ) | |
| Appellant. | ) | Filed: April 19, 2022 |

Michael E. Gardner, P.J., James M. Dowd, J., and Lisa P. Page, J.

## OPINION

Defendant Carl Justin Townsend appeals his convictions for first-degree assault, armed criminal action, and unlawful possession of a firearm resulting in a 26-year sentence following a jury trial in which Townsend claimed self-defense. This case arose from a July 23, 2018, incident in which Townsend shot and wounded Ricky Koenen, the son of one of Townsend's tenants on property Townsend owned in rural St. Charles County. Ricky Koenen's mother Suzanne Koenen and Townsend's other tenant, Rick Shuttleworth, had agreed to vacate the property that day in exchange for Townsend waiving the last 90 days of rent payment. Before the shooting, Townsend and Suzanne Koenen had engaged in a verbal altercation and Townsend and Ricky Koenen had engaged in a verbal *and* physical altercation.

Townsend brings multiple points of error. We reverse and remand for a new trial because we find the trial court plainly erred in two respects each of which substantially compromised Townsend's ability to fully assert his defense of self-defense. First, the trial court plainly erred by excluding Townsend's testimony that an hour before the shooting the victim's mother, Suzanne Koenen, threatened Townsend that her son Ricky Koenen was going to come to the scene and "blow your fuckin' head off, you no good nigger" and that Townsend was "nothing but a no good nigger." Second, the court plainly erred by allowing lay witness Lisa Poe to testify to Missouri's specific legal requirements to carry out an eviction when the undisputed record in this case was that this was not an eviction but an agreed-upon departure of the premises in exchange for waived rent payments. By allowing this testimony, the trial court permitted the State to improperly and without foundation insert the issue into this case that Townsend was unlawfully on the property and therefore had a duty to retreat from his confrontation with Ricky Koenen.

Our holding as to these related issues, which disposes of four of Townsend's seven points relied on, renders moot Townsend's remaining three points though we briefly address the issues raised in those points since they may recur upon retrial.[1]

---

[1]Point IV: Townsend asserts the trial court abused its discretion by permitting, under the excited utterance exception to the hearsay rule, the detective's testimony that repeated Ricky Koenen's prior statement to the detective because (1) the testimony did not satisfy the excited utterance exception, (2) it was cumulative of Koenen's trial testimony, and (3) it improperly bolstered Koenen's credibility.
Point V: Townsend challenges the court's exclusion of evidence of Ricky Koenen's methamphetamine use after Koenen testified he had not continued to use drugs after his 2002 court-martial conviction for drug use. Townsend sought to cross-examine Koenen with his prior deposition testimony that he used methamphetamine repeatedly, that he used it with his mother and the other tenant at the premises in question, that he used it as recently as within a week of the shooting, and that he tested positive for amphetamine at the hospital the day after the shooting. The trial court also disallowed the emergency room doctor's testimony by way of an offer of proof that amphetamine generally takes two to four days to leave the body after ingestion.

2

## Background

Townsend and his wife owned a 7-acre lot in rural St. Charles County. In April 2018, Leo Kruse deeded to Townsend the adjacent lot where Rick Shuttleworth resided as a tenant and Suzanne Koenen resided in a nearby mobile home and reportedly served as Mr. Shuttleworth's caretaker. On the day Townsend assumed ownership of the property, he and Shuttleworth agreed that in exchange for Townsend waiving Shuttleworth's obligation to pay rent for 90 days, Shuttleworth and Ms. Koenen would voluntarily vacate the premises on July 23, 2018.

When Townsend arrived to the property on the afternoon of July 23, 2018, he observed that Shuttleworth and Ms. Koenen were in the process of packing their effects to vacate the property. During Townsend's initial encounter with Suzanne Koenen that day, she became upset and began profanity-laced verbal attacks on Townsend which, according to Townsend, included the threat that "my son is going to come here and blow your fuckin' head off, you no-good nigger" and "you are nothing but a no-good nigger." Townsend left the property and returned to his own house nearby.

Approximately an hour later, Shuttleworth asked Townsend to come back to the property to unlock a shed so Shuttleworth could retrieve his lawnmower. Townsend's wife, who was aware of the previous exchange between Townsend and Suzanne Koenen, recommended that Townsend take a firearm with him and he did so. When Townsend returned to the property to unlock the shed, Suzanne Koenen's son Ricky Koenen had arrived to help his mother complete her move-out. He was also armed with a pistol.

---

Point VII: Townsend claims the court plainly erred in failing to submit to the jury an instruction defining the term "lawfully remaining" as used in the self-defense instruction.

3

When Townsend observed Ricky Koenen throwing onto the ground large quantities of trash from a trailer Koenen owned that was parked on the property, Koenen and Townsend exchanged words regarding the trash. At that point, Suzanne Koenen renewed her verbal attacks on Townsend including "you're a dead nigger," to which Townsend responded, "shut the fuck up and leave."

Ricky Koenen testified that he brought his handgun with him from home to protect himself. He stated that when Townsend came to unlock the shed, Townsend had his gun drawn and was pointing it at Koenen ordering him to pick up the trash. Townsend claimed that when he approached, his gun was lodged in his back waistband. Then, after Townsend told Suzanne Koenen to "shut the fuck up and leave," Ricky Koenen jumped down from the trailer to a position directly in front of Townsend and told Townsend, "don't talk to my fuckin' mother like that." Koenen testified that Townsend then swung his right arm to hit Koenen but missed. Townsend, for his part, claimed he swung his fist at Koenen only after Koenen had pushed him. Koenen stated that at that point he no longer saw Townsend's gun in either hand and that he put Townsend in a choke hold around his neck for 5-6 seconds. While the two struggled on the ground, Koenen then noticed the gun in Townsend's hand again. At that point, Koenen released his hold on Townsend and said he tried to run or back away when Townsend shot him wounding him in his right arm and buttocks.

Townsend claimed that after he managed to draw his weapon from his back waistband while the two struggled on the ground, Koenen released his hold and scampered away, and that after Koenen separated himself by several yards, he rose to his feet, drew his weapon, cocked it, and pointed it at Townsend. At that point, Townsend fired his gun multiple times.

4

Townsend was charged as a prior and persistent offender[2] with one count each of first-degree assault, armed criminal action, and unlawful possession of a firearm. After a three-day jury trial beginning on February 4, 2020, in the Circuit Court of St. Charles County, Townsend was found guilty on all counts. The court sentenced him on July 14, 2020, to 26 years in the Missouri Department of Corrections. Townsend's motion for new trial was denied and this appeal follows.

## Standard of Review

On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict. *State v. Rice*, 504 S.W.3d 198, 200 n.3 (Mo. App. W.D. 2016). "We review trial court decisions regarding the admission or exclusion of evidence for abuse of discretion" that results in prejudice to the defendant. *State v. White*, 835 S.W.2d 942, 947 (Mo. App. E.D. 1992). A trial court abuses its discretion when its ruling is "clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* "To succeed on appeal, an appellant must also show that the trial court's abuse of discretion was 'so prejudicial that it deprived the defendant of a fair trial.'" *State v. Culpepper*, 505 S.W.3d 819, 828 (Mo. App. S.D. 2016).

Under certain circumstances, we may review unpreserved errors under our plain error standard of review. *See State v. Speed*, 551 S.W.3d 94, 97 (Mo. App. W.D. 2018) (citing *State v. Clay*, 533 S.W.3d 710, 718 (Mo. banc 2017)); Rule 30.20.[3] Rule 30.20 states in relevant part that "[w]hether briefed or not, plain errors affecting substantial rights may be considered in the

---

[2] In 1996, at age 17, Townsend was convicted of second-degree assault and illegal possession of a gun. In 2001, he was convicted of second-degree drug trafficking; and in 2011, Townsend was convicted for being a felon in possession of a firearm.

[3] All rule references are to the Missouri Rules of Criminal Procedure (2020) unless otherwise indicated.

discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." *See Speed*, 551 S.W.3d at 98 (citing *State v. Taylor*, 466 S.W.3d 521, 533 (Mo. banc 2015).

Plain error review is a two-step process. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009). First, we must determine whether the claim of error "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted.'" *Baumruk*, 280 S.W.3d at 607 (quoting *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995)); *State v. McKay*, 459 S.W.3d 450, 455-56 (Mo. App. E.D. 2014); Rule 30.20. Not every prejudicial error, however, constitutes plain error, as plain errors are "evident, obvious, and clear." *Id.* If the claim of plain error facially establishes grounds for believing that manifest injustice or a miscarriage of justice resulted, we may elect to exercise our discretion and proceed to the second step to consider whether or not a miscarriage of justice or manifest injustice will occur if the error is left uncorrected. *Id.*; *State v. Smith*, 370 S.W.3d 891, 894 (Mo. App. E.D. 2012).

In *State v. Nolan*, the Missouri Supreme Court recognized that the meaning of the term "manifest injustice" is difficult to articulate, stating:

> [T]he cases give the distinct impression that "plain error" is a concept appellate courts find impossible to define, save they know it when they see it. Whether an appellate court should take notice of an error not raised below must be made on the facts of the particular case, and there are no hard and fast classifications in either the application of the principle or the use of a descriptive.

872 S.W.2d 99, 103 (Mo. banc 1994) (*overruled on other grounds by Deck v. State*, 68 S.W.3d 418, 427 (Mo. banc 2002)).

6

## Discussion

### A. The exclusion of Suzanne Koenen's threat.

Townsend's first three points address the trial court's exclusion on hearsay and relevancy grounds his testimony that approximately one hour before the shooting, Suzanne Koenen threatened him that her son Ricky Koenen was going to come to the property and "blow your fuckin' head off, you no good nigger." Townsend is African American. We first address the hearsay issue and conclude that Suzanne Koenen's graphic and lethal threat, delivered with profanity and racial epithets, was not hearsay but went to Townsend's state of mind which was relevant to his defense of self-defense.

Hearsay is an out-of-court statement which is offered to prove the truth of the matter asserted and which depends on the veracity of the statement for its value. *State v. Taylor*, 298 S.W.3d 482, 492 (Mo. banc 2009). Out-of-court statements that are not offered to prove the truth of the matter asserted but are offered to prove some other relevant issue are not subject to a hearsay objection. *State v. Basile*, 942 S.W.2d 342, 357 (Mo. banc 1997); *State v. Nabors*, 267 S.W.3d 789, 794 (Mo. App. E.D. 2008); *see also, e.g., State v. Hendrix*, 699 S.W.2d 779, 782 (Mo. App. S.D. 1985) (threatening statements made by victim of a homicide or assault and communicated to the defendant are not hearsay when offered to prove the defendant's apprehension of danger); *State v. Brown*, 998 S.W.2d 531, 547 (Mo. banc 1999) (murder victim's out-of-court statements were admissible to show her fear of defendant, not to show the truth of the matters asserted, and were particularly relevant where defendant claimed accident, self-defense, or suicide).

In cases where self-defense is alleged, the defendant's state of mind is critical. *State v. Gonzalez*, 153 S.W.3d 311, 314 (Mo. banc 2005). Under the state-of-mind exception to the

7

hearsay rule, statements that go to a defendant's state of mind may be admissible in cases involving claims of self-defense, suicide, or accidental death. *State v. Martinelli*, 972 S.W.2d 424, 435 (Mo. App. E.D. 1998). Direct evidence of an individual's particular state of mind is rarely available. *State v. Ray*, 945 S.W.2d 462, 468 (Mo. App. W.D. 1997) (citing *State v. Turnbough*, 876 S.W.2d 19, 21 (Mo. App. E.D. 1994)). Instead, it may be inferred from all the circumstances. *Id.* (citing *State v. Holt*, 758 S.W.2d 182, 186 (Mo. App. E.D. 1988)).

The paramount purpose of the rules of evidence is to ensure that the trier of fact will have before it all relevant, reliable, and probative evidence on the issues in dispute. *State v. Waller*, 816 S.W.2d 212, 215 (Mo. banc 1991). Since the defendant's state of mind is of such significance, it is important that the defendant be able to relate reasons for his or her state of mind. *Id.* "The highly probative nature of such relevant evidence, in an appropriate case, far outweighs any prejudice caused by the admission of such evidence." *Id.* The declaration must be relevant to the issue of the case and the relevance of these statements must not be outweighed by the prejudicial effect of the declarations. *Ray*, 945 S.W.2d at 467, 469 n.8.

In light of the foregoing authorities, Townsend's proposed testimony as to Suzanne Koenen's threat was not hearsay but was relevant to Townsend's defense of self-defense in that it went to his state of mind at the time of the shooting. The proposed testimony was not offered to prove that Townsend was somehow the embodiment of that reprehensible racial slur, but to explain Townsend's subsequent state of mind and resulting conduct which made the testimony critical to his claim of self-defense. By excluding it, the trial court prevented the jury from having "all relevant, reliable, and probative evidence on the issues in dispute." *Waller*, 816 S.W.2d at 215.

8

The State makes much of the fact that the threat at issue was not made by the victim in this case, Ricky Koenen, but by his mother and that Townsend failed to demonstrate that Ricky Koenen knew about the threat or subscribed to his role in the threat. The State misses the mark in this regard because it focuses on Ricky Koenen's state of mind instead of the defendant's. As the foregoing authorities demonstrate, testimony that is relevant to Townsend's state of mind is not limited to statements coming from the victim alone. *See, e.g., id.*; MAI-CR 4th 406.06. Instruction 7, the self-defense instruction that was given to the jury in this case, speaks of "reasonable grounds" that would make the defendant "reasonably believe" that the use of physical force was necessary to defend himself. MAI-CR 4th 406.06. Again, it does not limit such facts or grounds to those emanating from the victim alone.

Instead, the question for the jury in this case was whether Townsend, at the time he fired his gun, had "reasonable grounds" to "reasonably believe" that such act was necessary to defend himself under the facts and circumstances of this case. We conclude the jury should have known that the victim's mother had made such a graphic threat laced with profanity and racial epithets within an hour of the victim Ricky Koenen showing up to the scene armed with a gun which according to Townsend's testimony he drew, cocked, and pointed at Townsend just before Townsend shot him.

Likewise, we are unpersuaded by the reasons the trial court gave for its ruling in this regard. Its first reason was that no other witness had testified to hearing Ms. Koenen's threat. We have found no support in Missouri law for the foundational requirement of a corroborating witness before a criminal defendant may testify to what he claims he heard at a supposed crime scene. It is the State's job through cross-examination to point that out to the jury and then it is the jury's job, not the trial court's, to decide whether the defendant's testimony is believable.

9

*State v. Selle*, 367 S.W.2d 522, 529 (Mo. banc 1963); *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 312 (Mo. App. E.D. 2018).

The second reason the trial court gave was that Townsend did not tell the police at the time of his arrest that Ms. Koenen had made those statements.[4] Again, the trial court assumed the jury's role to determine the weight and credibility of testimony and relieved the State of its adversarial task through cross examination to convince the jury Townsend was not believable. *Selle*, 367 S.W.2d at 529. The jury certainly could have disbelieved Townsend's testimony. *See State v. Redmond*, 937 S.W.2d 205, 209 (Mo. banc 1996) ("A jury may accept part of a witness' testimony while disbelieving other portions.") But depriving the jury of the complete and relevant picture of what transpired that day stripped the jury of one of its most important roles in our system of jurisprudence – to determine the credibility of witnesses, resolve conflicts in testimony, and give whatever weight to evidence it deems appropriate. *Rousan v. State*, 48 S.W.3d 576, 595 (Mo. banc 2001).

"Trials are truth-seeking procedures and exclusion of relevant evidence is not favored." *State v. Boss*, 577 S.W.3d 509, 516 (Mo. App. W.D. 2019) (citing *Taylor*, 298 S.W.3d at 502). Trial courts are to be gatekeepers in determining whether evidence is admissible; however, "[w]eight and credibility are the province of the jury." *Id.* at 516-20 (citing *State v. Petty*, 967 S.W.2d 127, 137 (Mo. App. E.D. 1998)). Simply put, the credibility of and weight given to

---

[4] During one extensive side-bar conference, the trial court explained that it was excluding the testimony because it was hearsay, too inflammatory, and no other witness had testified to it. The court threatened Townsend with sanctions and said that "everything coming out of his mouth is hearsay ... there's been no indication that this altercation had anything to do with a racial slur ... [s]o I'm not going to let you prejudice the jury and the State's case by just allowing him to come up and say this where there's been no foundation or basis for it."

10

witness testimony is ultimately for the jury to decide. *State v. Evans*, 517 S.W.3d 528, 540 (Mo. App. S.D. 2015) (citing State v. *Davis*, 814 S.W.2d 593, 603 (Mo. banc 1991)).

We next turn to the State's assertion that the racial epithet portion of the threat was properly excluded because racial epithets are not relevant to the issue of self-defense. The State relies on *Dorsey v. State*, 113 S.W.3d 311 (Mo. App. S.D. 2003) for the proposition that "mere insults are not sufficient to justify an assault or make the speaker the aggressor." *Id.* at 316. We agree with this proposition of law but find it irrelevant to our analysis. If Townsend had offered the racial epithet testimony to prove that Ricky Koenen was the initial aggressor, then the State would be right. But Townsend offered the testimony to prove his state of mind.

Likewise, we reject the State's effort to parse Suzanne Koenen's alleged threat into two distinct parts, i.e., (1) that her son was going to "blow [Townsend's] fuckin' head off" and (2) that Townsend was a "no good nigger." We need not speculate that for a person of color "you no-good nigger" is part and parcel of, and serves as an enhancing qualifier to, Suzanne Koenen's threat. Simply put, it is part of the threat.[5]

The transcript demonstrates that the trial court's principal concern was the highly inflammatory nature of the racial epithets. We agree it is a vile word with ignominious meanings but that alone is not sufficient to exclude what is otherwise admissible testimony. Indeed, the inflammatory nature of racial epithets often demonstrates its probative value. *See Jones v. Cassady*, No. 4:18 CV52 ACL, 2021 WL 1088333, at *4 (E.D. Mo. Mar. 22, 2021) (holding that the defendant's use of a derogatory racial term demonstrated the defendant's "general animus"

---

[5] Townsend ultimately testified that he considered that his life had been threatened. This testimony did not render harmless the court's exclusion of Ms. Koenen's threat because his vague testimony and her threat are by no means the same. Townsend's testimony not only lacked the graphic and offensive language but it failed to identify who made the threat, and who was to carry out the threat. *See State v. Duncan*, 397 S.W.3d 541, 544 (Mo. App. E.D. 2013).

11

toward the victim and was logically relevant); *State v. McDaniel*, 254 S.W.3d 144, 147 (Mo. App. E.D. 2008) (any perceived prejudice from the admission of evidence of racial epithets at trial "can be attributed to the very probativeness of the challenged evidence."); *State v. Thomas*, 272 S.W.3d 421, 427 (Mo. App. E.D. 2008) (for the concept that the use of racial slurs is "highly relevant.")

Relevant evidence is not inadmissible simply because it is prejudicial. *State v. Wood*, 596 S.W.2d 394, 403 (Mo. banc 1980). Missouri courts have long recognized that the inflammatory nature of otherwise admissible evidence alone does not justify its exclusion, and that if evidence is relevant, it should not be rejected unless the situation is so unusual that the extent of the prejudice overrides the probative value. *Speed*, 551 S.W.3d at 99; *State v. Murray*, 744 S.W.2d 762, 772 (Mo. banc 1988).

Here, Ms. Koenen's threat helps explain Townsend's resulting state of mind as well as his actions. The exclusion of that evidence deprived the jury of a complete understanding of the facts to determine whether Townsend's use of force was justified. Denying Townsend the opportunity to adduce this threat evidence deprived him of being able to fully explain to the jury his decision to shoot and, therefore, deprived him of fully presenting his claim of self-defense.

Inasmuch as the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense," *Crane v. Kentucky*, 476 U.S. 683, 688 (1986) (citing *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984)), we conclude that the exclusion of the proffered evidence that went to Townsend's state of mind at the time of the shooting deprived him of that right and resulted in prejudice. *See also, Ray*, 945 S.W.2d at 469 (finding that the exclusion of the "events" leading up to the shooting allowed the State to unfairly portray Ray as a cold-blooded killer.)

12

Turning to the standard of review, Townsend repeatedly sought to convince the trial court to allow him to testify to Suzanne Koenen's threat, and the record demonstrates the trial court was fully aware of Townsend's legal position that the testimony was not hearsay and was relevant to Townsend's state of mind. Yet, Townsend failed to include this claim of error in his new trial motion. Thus, our review is pursuant to our plain error review standards cited above.

Nevertheless, we conclude that Townsend has demonstrated that plain error occurred. The exclusion of Suzanne Koenen's alleged threat given its relevance to the key issue in this case – whether Townsend acted in self-defense – constitutes an evident, obvious, and clear error. *See Baumruk*, 280 S.W.3d at 607. Moreover, the excluded testimony would likely have been highly impactful on the jury's comprehension of the fateful confrontation that day and Townsend's state of mind which leads us to conclude that its exclusion resulted in a manifest injustice or miscarriage of justice. *Smith*, 370 S.W.3d at 894; *McKay*, 459 S.W.3d at 460.

**B.     The admission of Lisa Poe's testimony.**

We find the trial court committed plain error in a second respect when it undermined Townsend's self-defense submission by improperly allowing the State to insert the false issue that an eviction was occurring the day of the shooting because it lacked any foundation in the evidence and went directly to Instruction 7, the self-defense instruction given in this case, by giving the jury a basis to find that Townsend was not lawfully on the property at the time of the confrontation and therefore had a duty to retreat from his confrontation with Ricky Koenen.

Lisa Poe, a neighbor who overheard some of the events that day, testified on behalf of the State to the legal requirements for an eviction in the state of Missouri. Specifically, Poe testified over objection that as part of an eviction, a landlord is not permitted to enter the leased premises unless accompanied by a sheriff's deputy. Townsend objected to this line of inquiry as irrelevant

13

and that it sought legal conclusions from a lay witness, but Townsend failed to include this claim of error in his motion for new trial.

Allowing Poe to testify in this regard injected into the case false but highly critical issues, namely, whether Townsend had the right to be where he was at the time of the confrontation and whether Townsend had a duty to retreat.[6] The critical nature of these issues is reflected in their presence in Instruction No. 7, which included the following:

> A person is not required to retreat before resorting [to] the use of physical force to defend himself [if] he is *lawfully remaining* on private property owned or leased by the person in a location that the person has a right to be.

(emphasis added).

There was simply no evidence that this case involved an eviction. The only evidence was that Townsend's tenants had agreed to vacate the property by July 23, 2018, which they were doing that day, in exchange for 90 days free rent, and that just before the confrontation tenant Shuttleworth had requested Townsend to come onto the property to unlock a shed. The purported foundation for Poe's testimony regarding the legal requirements to conduct an eviction was her self-serving testimony that from her property over 500 feet away from the scene, she heard someone say something about an eviction. This hearsay found no support from any other witness, including those present at the time of the altercation. *See State v. Presberry*, 128 S.W.3d 80, 89-90 (Mo. App. E.D. 2003).

The false narrative the trial court allowed Poe to present to the jury, based on her unsupported supposition that this was an eviction, was that Townsend should not have been on

---

[6] Although not adequately raised and also not critical to our disposition, we are dubious whether Poe, as a lay witness with some limited personal experience with evictions, was competent to provide what was essentially expert testimony on the legal requirements for conducting an eviction in Missouri. Section 490.065; *State v. Minner*, 256 S.W.3d 92, 97 (Mo. banc 2008).

14

the property at the time of the confrontation and could only have come onto the property with a court order accompanied by a sheriff's deputy. Again, in a self-defense case, whether the defendant was lawfully on the property is critical. By allowing the State through Poe to inject that issue, the court permitted the State to call into question whether Townsend had a duty to retreat because he was not "lawfully" on the property at the time of the confrontation.

We turn again to our plain error review standards since Townsend failed to include this claim of error in his motion for new trial. *State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006). We conclude that it was clear, obvious, and evident error to allow Poe to inject a false issue into the case, unsupported in the record, that went to critical issues addressed in the self-defense instruction in this case. We presume the jury followed the instructions. We likewise presume the jury considered Poe's testimony in determining whether Townsend was "lawfully" present at the time and whether he had a duty to retreat. In our judgment, this satisfies the high threshold of prejudice tantamount to a manifest injustice.[7]

## C. Townsend's remaining points on appeal.

Townsend's remaining points on appeal are rendered moot given our disposition above. Nevertheless, on retrial the issues raised in those points may recur so we address them briefly.

### 1. Point IV.

Here, Townsend argues the trial court abused its discretion by allowing Detective Anderson, who interviewed Ricky Koenen after he was medically stable and in a regular hospital room over an hour after the shooting, to repeat to the jury over the course of 10 transcript pages Koenen's out-of-court statements made at that time because such testimony was inadmissible

---

[7] We deny as moot Townsend's seventh point in which he argues the trial court plainly erred in failing to define "lawfully remaining" in Instruction No. 7 because in the absence of that definition, the jury was given a roving commission to supply its own erroneous interpretation.

15

hearsay and improperly bolstered Koenen's credibility. The trial court reasoned that the excited utterance exception to the hearsay rule applied. The State based its excited utterance argument on the detective's testimony that Koenen "appear[ed] to be under the effects and excitement of the shooting" and appeared to be "hurting."

In the event this issue recurs on retrial, the trial court should review and consider the following authorities. "An alleged 'excited utterance' is viewed by Missouri courts as presumably inadmissible because it is hearsay." *State v. Kemp*, 919 S.W.2d 278, 280 (Mo. banc 1996). "This exception [to the hearsay rule] is premised on the idea that where the statement is made under the immediate and uncontrolled domination of the senses as a result of the shock produced by the event, the utterance may be taken as expressing the true belief of the declarant," *State v. Strong*, 142 S.W.3d 702, 718 (Mo. banc 2004), "when consideration of self-interest could not have been brought to bear through reflection or premeditation." *Kemp*, 919 S.W.2d at 280. "The essential test for admissibility of a spontaneous statement or excited utterance is neither the time nor place of its utterance but whether it was made under such circumstances as to indicate it is trustworthy." *Strong*, 142 S.W.3d at 718. "The essential test of this class of statements is spontaneity." *Hamilton v. Missouri Petroleum Products Co.*, 438 S.W.2d 197, 200 (Mo. banc 1969).

Statements made in response to police interrogation and not as a "spontaneous reaction" to the stress of the situation do not come within the exception to the hearsay rule. *State v. Stevens*, 757 S.W.2d 229, 233-34 (Mo. App. E.D. 1988). Statements obtained in response to questions "inherently require[] reflection" by the declarant. *State v. Smith*, 265 S.W.3d 874, 877 (Mo. App. E.D. 2008).

16

Missouri courts have remained true to the foregoing principles in determining whether hearsay statements satisfy the spontaneity test. *Compare Culpepper*, 505 S.W.3d at 829 (statement made to police within minutes after the shooting by victim while screaming that she had been shot, still bleeding and in severe pain, and before medical personnel arrived, was admissible as excited utterance), *with Hamilton*, 438 S.W.2d at 200 ("[i]n this case the statement was not made until twenty-five minutes after the incident claimed to be the exciting cause ... [W]e cannot justify its admission on this basis."), *and Walsh v. Table Rock Asphalt Const. Co.*, 522 S.W.2d 116, 121 (Mo. App. S.D. 1975) (statements "made at least 15 to 35 minutes after the accident" should have been excluded).

Improper bolstering occurs when an out-of-court statement is offered solely to duplicate or corroborate trial testimony. *State v. Ramsey*, 864 S.W.2d 320, 329 (Mo. banc 1993). "When a witness testified from the stand, the use of duplicating and corroborative statements is substantially restricted ... [because] [t]he party who can present testimony in multiple forms may obtain an undue advantage." *State v. Seever*, 733 S.W.2d 438, 441 (Mo. banc 1987).

2.    Point V.

Townsend complains in point V that the trial court improperly excluded from evidence Ricky Koenen's methamphetamine use. The record, including Townsend's various offers of proof, demonstrates that after Koenen testified on cross-examination that he had not continued to use drugs since his 2002 military court-martial for drug use, Townsend repeatedly sought to adduce evidence of Koenen's methamphetamine use. In his prior deposition testimony and during Townsend's offer of proof, Koenen admitted to frequent methamphetamine use, that he used it with his mother and the other tenant at the premises in question, that he used it as recently as within a week of the shooting, that he tested positive for amphetamine the day after the

17

shooting, and that he told hospital personnel he was a marijuana and methamphetamine user. During an offer of proof, Townsend elicited through Dr. Ferguson, the emergency room doctor who treated Koenen and ordered Koenen's toxicology test, that methamphetamine stays in the body for up to four days after ingestion.

On retrial, the trial court should review and consider the following authorities when assessing whether Koenen's admitted methamphetamine use may be admissible for impeachment purposes or may be admissible on the issue whether Koenen was under the influence of methamphetamine at the time of the confrontation with Townsend. "As a general proposition, the credibility of witnesses is always a relevant issue in a lawsuit." *Mitchell v. Kardesch*, 313 S.W.3d 667, 675-76 (Mo. banc 2010). Impeachment provides a tool to test a witness's perception, credibility, and truthfulness, which is essential because a jury is free to believe any, all, or none of a witness's testimony. *Id.*; *see also Talley v. Richart*, 185 S.W.2d 23, 26 (Mo. 1945) (a party impeaches a witness to discredit the witness in the eyes of the fact-finder). As the Supreme Court noted in *Sandy Ford Ranch, Inc. v. Dill*:

> It has long been the rule in Missouri that on cross-examination a witness may be asked any questions which tend to test his accuracy, veracity or credibility or to shake his credit by injuring his character. He may be compelled to answer any such question, however irrelevant it may be to the facts in issue, and however disgraceful the answer may be to himself, except where the answer might expose him to a criminal charge.

449 S.W.2d 1, 6 (Mo. banc 1970).

Missouri courts have taken a broad view on whether the subject of the prior inconsistent statement was "material" to the case. *Id.* In *Kearbey v. Wichita Southeast Kansas*, 240 S.W.3d 175, 187 (Mo. App. W.D. 2007), the court allowed Kearbey to be questioned and then cross-examined with inconsistent responses on two medical questionnaires regarding marijuana use. *Id.* The court rejected Kearbey's argument that the "marijuana use had no relevance to the case"

18

and, citing the principles from *Sandy Ford Ranch*, the court found that "the jury could infer that a person who is not consistently truthful in statements made to other persons might also be untruthful in his testimony on the witness stand[,]" and that "[t]he fact that marijuana use was the underlying topic of disclosure in the questionnaires and such use itself was irrelevant to the issues at trial is immaterial." *Id.* Such an attack is relevant to witness credibility and is within the permissible scope of cross-examination.

In *State v. Phillips*, 939 S.W.2d 502, 504 (Mo. App. W.D. 2018), the State asked the defendant whether he had used methamphetamine the evening the crimes occurred. *Id.* at 505. After he responded that he had not, the trial court permitted the State to impeach him with "the fact the arresting police officers found a white substance in his trouser pockets." *Id.* On appeal, the court found the impeachment proper because "[t]he accuracy of Mr. Phillips' recollection of events was directly at issue in the trial" and "[w]hether Mr. Phillips was experiencing the influence of alcohol or drugs was relevant in evaluating whether his perceptions were accurate or reasonable." *Id.* at 504.

In *State v. Selvy*, 921 S.W.2d 114, 116 (Mo. App. S.D. 1996), the defendant testified in his murder trial. During cross-examination, he denied that he was "high on cocaine" at the time of the crime. *Id.* The prosecutor then asked if he had used cocaine within the four days immediately before the shooting which he also denied. *Id.* The State then presented as rebuttal evidence urinalysis results showing defendant had used cocaine within the four days before the shooting. *Id.* On appeal, the court found the cross-examination to be proper because:

> A witness' abnormality is a standard ground for impeachment and one form of abnormality is that which exists when one is under the influence of drugs or drink. If a witness is "under the influence" at the time of the occurrence or at the time he testifies, this condition is provable, on cross or by extrinsic evidence, to impeach. McCormick, Law of Evidence § 45 (2d Ed.1972).

19

*Id.* (citing *State v. Myers*, 538 S.W.2d 892, 897-98 (Mo. App. E.D. 1976)).

The court reasoned that since "the prosecuting attorney had a basis for believing defendant used cocaine within such time prior to when [the victim] was shot to affect his perception of what occurred," it was proper for "the prosecuting attorney to ask defendant if he had used cocaine and, upon his denying its use, to present rebuttal evidence that he had." *Id.*

## Conclusion

In light of the foregoing, we reverse and remand this case for a new trial.

James M. Dowd, Judge

Michael E. Gardner, P.J., and
Lisa P. Page, J., concur.

20